# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Carol Skare,

                              Plaintiff,

                                             Civ. No. 05-1423 (RHK/AJB)
                                             **MEMORANDUM OPINION
                                             AND ORDER**

v.

Extendicare Health Services, Inc,

                              Defendant.

Clayton D. Halunen, Molly E.D. Gage, and Joni M. Thome, Halunen & Associates, Minneapolis, MN for Plaintiff.

John D. Thompson, Oberman Thompson & Segal, LLC, Minneapolis, MN for Defendant.

## Introduction

Plaintiff Carol Skare has sued her former employer, Defendant Extendicare Health Services, Inc. ("Extendicare") under the Minnesota Whistleblower Act, Minn. Stat. § 181.932, alleging that she was retaliated against for reporting violations of various laws, regulations, and company policies. Extendicare now moves for summary judgment on the grounds that, *inter alia*, Skare did not suffer an adverse employment action and did not engage in protected conduct under the statute. For the reasons set forth below, the Court will grant the Motion.

**Background**

Extendicare is a for-profit company that operates nursing homes in the Twin Cities. Each Extendicare home has an Administrator, who has overall responsibility for the facility, and a Director of Nursing ("DON"), who has overall clinical responsibility for the facility. (Cullen Aff. ¶ 8.)  Extendicare homes are grouped into regions, and each region has a Regional Nurse Consultant ("RNC"), who works with DON's in the region from a clinical perspective to ensure compliance with corporate clinical programs and regulatory standards.  (Id. ¶ 9.)

Skare worked at Extendicare from 1997 to 2005; she began her employment as a DON.  In February 2000, she was promoted to the position of RNC.  As an RNC, Skare was responsible for the clinical outcomes of eight facilities.  In that position, she reported to Jackie Stone, the Area Director of Care Management ("ADCM") for Minnesota and Wisconsin.  (Stone Dep. Tr. at 6, 8-9.)  In April 2004, Jim Burke became the Regional Director of Operations ("RDO") for Skare's region.  (Cullen Aff. ¶ 10.)  Burke, as the RDO of that region, was also one of Skare's superiors.[1]  In the summer of 2004, Sandy Goodin-Hicks replaced Stone as the ADCM.  (Stone Dep. at 15.)

In April 2004, Skare was assigned to be the interim DON at the Robbinsdale Extendicare home ("Robbinsdale") after the previous DON was terminated.[2]  (See Compl. ¶

---

[1]The Administrators in a region report to that region's RDO, who works with the RNC when clinical issues are involved.  (Cullen Aff. ¶ 9.)

[2]According to her Complaint, Skare was promised "that someone else would be assigned to cover her [RNC] duties."  (Compl. ¶ 24.)

24; Mem. in Opp'n at 9.)  In late-June or early-July 2004, Skare learned that she would be

staying on as the permanent DON at Robbinsdale, and that she would no longer have RNC

responsibilities.[3]  (Skare Aff. ¶ 20.)  Burke was primarily responsible for the decision to

make Skare the permanent DON at Robbinsdale.[4]  (See Stone Dep. Tr. at 72-3.)  As DON at

Robbinsdale, Plaintiff was no longer responsible for the eight different facilities previously

assigned to her; rather, she had "direct clinical responsibility for the planning, organization,

direction, supervision, and evaluation of all nursing care and services for all residents in"

the Robbinsdale facility.  (Cullen Aff. ¶ 16; see also id. ¶¶ 17, 18.)  She also had "direct

responsibility to manage . . . one of the highest and substantial nursing budgets . . . in the

Twin Cities."  (Id.)  Skare's pay remained unchanged despite her change in position (at

$83,000 annually).[5]  (Skare Dep. Tr. at 157.)  Dan Erickson was the Administrator at

Robbinsdale for the entire time that Skare was the DON there.  (Cullen Aff. ¶ 20.)

Skare claims that, throughout her tenure with Extendicare, she made numerous

comments to many Extendicare employees about various perceived shortcomings in

---

[3]Skare felt that the way in which she found out about the change in position "was disrespectful."  (Schug Dep.Tr. at 48; see also Skare Aff. ¶ 20;.)  She learned "second-hand," after Burke announced the change in position at an Administrators' meeting.  (Skare Aff. ¶ 16; Skare Dep. Tr. at 71.)

[4]Stone may also have had some involvement in making the decision to place Skare in the DON position.  (See Stone Dep. Tr. at 72-3; Skare Dep. Tr. at 72-3.)

[5]Skare had a higher salary as DON than any other RNC in the Minnesota-Wisconsin area, except for one RNC whose salary was the same as Skare's.  (Cullen Aff. ¶ 35.)

Extendicare's policies and procedures.  For the most part, she complains that nothing was done in response to her complaints.[6]

Skare complained to various Extendicare employees, including Burke, about the fact that, at times, some Extendicare homes did not have licensed Administrators assigned to them, in violation of state law.  (Skare Dep. Tr. at 28, 35-37.)  Skare claims that Burke retaliated against her for this complaint by belittling and ridiculing her and by asking her for hugs on three occasions.  (Id. at 40.)

Skare also complained numerous times about the "Green Flag" program that Extendicare implemented in early 2002.  (See Skare Dep. Tr. at 49-51.)  The Green Flag program identified a set of diagnoses that all facilities had the ability to handle, which was communicated to referral sources so that they would know the facilities' capabilities.  (Cullen Aff. ¶ 12; see also Thompson Aff. Exs. 11, 27.)  If a potential resident's diagnosis fit into one of the "green" categories, the facility automatically determined that it was able to handle the resident, and it could then move forward with the formal admissions process with the patient.  (Cullen Aff. ¶ 13.)  Skare claims that this program resulted in the

---

[6]Her claims of retaliation revolve around Burke and her alleged complaints to him. (See, e.g., Skare Dep. Tr. at 35-40, 75-80.)  Specifically, Skare does not claim that Stone or Goodin-Hicks retaliated against her.  (See Skare Dep. Tr. at 71-2 (Q: "Are you aware of anything [Goodin-Hicks] did to take some adverse action against you because you complained about the Green Flag Program or taking residents that the company shouldn't have taken?"  A: "No."); 120-21 (Q: "[Y]our position is not that [Stone] was affirmatively trying to hurt you, but just that she wasn't . . . doing anything to help you?"  A: "I would agree with that.").)  Nor does she claim that other employees to whom she complained (and whose positions were supervisory to hers) retaliated against her, such as Fabian Calisto (Burke's predecessor) and Karlyn Saffran (Goodin-Hicks's boss).  (Id. at 72-3.)

admission of residents for whom facilities could not properly provide care.  (Skare Dep. Tr. at 43-46.)  She asserts that she talked to Burke about the Green Flag program when she was RNC and interim DON at Robbinsdale.  (Skare Dep. Tr. at 66.)  Skare "shared concerns with the ability of buildings to be able to care for patients that were being automatically admitted off of the Green Flag Program."  (Id.)  She does not remember "the exact day" that she talked to Burke about her "concerns," nor does she remember "his exact response."  (Id.)

Skare also claims that she complained to Burke and others about Robbinsdale's admission of a patient who weighed over 900 pounds.  (Skare Dep. Tr. at 49-50.)  In late-June 2004, Skare denied the patient's admission because she did not believe that Robbinsdale had the capability to properly care for him.  (Id.)  Her decision to refuse his admittance was overturned shortly thereafter, and the patient was admitted.  (Id. at 49-50, 60-68.)  Skare claims that she told Burke that Robbinsdale did not have the capability to care for the patient, but that Burke did not seem to care.  (Skare Dep. Tr. at 67.)

According to Skare, Burke retaliated against her for raising the forgoing concerns, by harassing and belittling her, asking her for hugs on three occasions, and demoting her from RNC to DON at Robbinsdale.  (See id. at 70-71.)

In November 2004, Skare received a letter from the Board of Nursing (the "Board") in regard to a citation given to Robbinsdale involving neglect of health care while she was DON.  (Thompson Aff. Ex. 7.)  Despite Skare's requests for legal representation from Extendicare, she did not obtain legal representation by the time she had to respond to the Board in December 2004.  (Skare Dep. Tr. at 96, 161; Skare Aff. ¶ 23.)  Skare did not

5

suffer any discipline from the Board, but was upset by the lack of responsiveness from Extendicare's legal department. (Id.) Skare does not claim that Extendicare's legal department's inaction was related to any complaints she made regarding the illegality of certain of Extendicare's practices. (Id. at 161 ("Q: If [the legal department] didn't get back to you, that was not in any way related to any kind of a complaint that you were making about illegal activity, was it? A. No. . . . But [the legal department] didn't get back to me, and I followed the corporate compliance reporting.").)

On January 7, 2005, following her appearance before the Board, Skare wrote a letter to Erickson providing Extendicare with notice that she was resigning effective February 2, 2005. (Thompson Aff. Ex. 27.) In her resignation letter, Skare stated:

> It has been my pleasure to work for Robbinsdale Rehab & Care Center as well as Extendicare. I have enjoyed working with many of the fine staff of professionals and will truly miss my association here at Robbinsdale. I wish you and Robbinsdale continued success in the future. . . .
>
> Thank you for allowing me to serve Robbinsdale Rehab & Care Center. Again, I wish you and the rest of the Robbinsdale staff continued success in the future.

(Id.) Skare asserts that she submitted her resignation "after believing that [she] had no other recourse to protect [her] nursing license, professionalism and ethics." (Skare Aff. ¶ 28.)

After Skare gave her resignation notice, Goodin-Hicks, one of her supervisors at the time, met with her to discuss her reasons for leaving. (Skare Dep. Tr. at 167.) Skare complained to Goodin-Hicks about being demoted six months earlier, about Burke's prior

conduct (he was no longer responsible for Robbinsdale as of November 2004[7]), and about

Erickson, the Administrator at Robbinsdale.  (Id.)  According to Skare, Goodin-Hicks said

Extendicare "screwed [Skare] over," and asked Skare to "name the position you want and the

salary you want."  (Skare Dep. Tr. at 168.)  Skare told Goodin-Hicks that she would "think

about it," but they did not speak about it again.  (Id.)

In July 2005, Skare sued Extendicare in state court alleging that her complaints were

protected conduct under the Minnesota Whistleblower Act, and that she was retaliated

against in violation of the Act.[8]  The action was removed to this Court based upon diversity

jurisdiction, and Extendicare now moves for summary judgment.

**Standard of Decision**

Summary judgment is proper if, drawing all reasonable inferences favorable to the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The moving party bears the burden of showing that the material facts in the case are

undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety

Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

---

[7]In November 2004, prior to the time that Skare decided to resign, Burke was
replaced by Sue Cullen as RDO responsible for Robbinsdale.  (Cullen Aff. ¶ 20.)

[8]Skare also brought a claim for negligent supervision, which has been dismissed by
stipulation of the parties.  (Doc. No. 80.)

nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th

Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

### Analysis

Minn. Stat. § 181.932 (the "Whistleblower Act" or the "Act") prohibits an employer

from taking adverse employment actions against an employee because the employee

performs certain protected activities.  For purposes of this action, those protected

activities consist of conduct in which:

> (d) the employee, in good faith, reports a situation in which the quality of
> health care services provided by a health care facility, organization, or health
> care provider violates a standard established by federal or state law or a
> professionally recognized national clinical or ethical standard and potentially
> places the public at risk of harm.

Minn. Stat. § 181.932, subd. 1(d).[9]

---

[9]The Act also prohibits retaliation against an employee who " . . . refuses an
employer's order to perform an action that the employee has an objective basis in fact to
believe violates any state or federal law or rule or regulation adopted pursuant to law, and
the employee informs the employer that the order is being refused for that reason."  Minn.
Stat. § 181.932(c).  To the extent that Skare contends that this provision applies here, Court
determines that she has not presented any probative evidence of a refusal to perform an
action, nor has she presented evidence showing that she at any time informed Extendicare
of such a refusal.

Skare claims she was retaliated against in violation of this subdivision.  Her claims are analyzed under the McDonnell Douglas framework, which provides that: (1) Skare has the initial burden of establishing a prima facie case, (2) the burden then shifts to Extendicare to articulate a non-retaliatory reason for any adverse employment action (if Skare is able to demonstrate that she suffered an adverse employment action), after which (3) Skare may show Extendicare's proffered reason is a pretext for discrimination.  Pope v. ESA Servs., Inc., 406 F.3d 1001, 1010 (8th Cir. 2005) (discussing burdens under the Whistleblower Act) (citing Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001)).  At all times, Skare has the burden to prove by a preponderance of the evidence that Extendicare's action was for an impermissible reason.  See Cokley, 623 N.W.2d at 630.

The elements of a prima facie case of retaliation under the Whistleblower Act are: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two."  Cokley, 623 N.W.2d at 630 (quoting Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)).  Extendicare argues that Skare has failed to present an issue of material fact as to any of the prongs of her prima facie case.  The Court will begin by considering whether Skare suffered an adverse employment action sufficient to establish her prima facie case.

**A.     Adverse Employment Action**

Skare contends that she suffered three adverse employment actions while employed at Extendicare.  First, that her job change from RNC "responsible for the clinical outcomes

of multiple facilities in Minnesota, to [DON] at a single, failing facility" was a demotion

and, as such, was an adverse employment action.  (Mem. in Opp'n at 32.)  Second, that she

was constructively discharged because her "working conditions were so intolerable, no

reasonable person would be expected to continue the employment."  (Id. at 34-39.)  Finally,

that she suffered harassment from Burke.  (Id. at 33.)

Extendicare contends that none of the forgoing constitutes an adverse employment

action.  An adverse employment action

> is a tangible change in working conditions that produces a material
> employment disadvantage . . . .  Termination, reduction in pay or benefits, and
> changes in employment that significantly affect an employee's future career
> prospects meet this standard . . . but minor changes in working conditions that
> merely inconvenience an employee or alter an employee's work
> responsibilities do not.

Duncan v. Delta Consol. Indus., Inc., 371 F.3d 1020, 1026 (8th Cir. 2004) (citations

omitted); see also Powell v. Yellow Book USA, Inc., — F.3d —, 2006 WL 1071855, at *4

(8th Cir. April 25, 2006); Wedow v. City of Kansas City, 442 F.3d 661, 671-72 (8th Cir.

2006).  It is well settled that "[c]hanges in duties or working conditions that cause no

materially significant disadvantage . . . are insufficient to establish the adverse conduct

required to make a prima facie case."  Harlston v. McDonnell Douglas Corp., 37 F.3d 379,

382 (8th Cir. 1994) (citations omitted).  It is equally well settled that "[a] transfer involving

only minor changes in working conditions and no reduction in pay or benefits will not

constitute an adverse employment action."  Ledergerber v. Stangler, 122 F.3d 1142, 1144

(8th Cir. 1997); see Brown v. Lester E. Cox Med. Ctrs., 286 F.3d 1040, 1045 (8th Cir.

2002) (citing <u>Ledergerber</u> and holding that "a transfer from one job to another is not an adverse employment action if it involves only minor changes in the employee's working conditions with no reduction in pay or benefits").

### 1.    Change in Position

With respect to the June 2004 change in position from RNC to DON at Robbinsdale, Skare contends that it was "not a mere change in work assignment" and that "she was not happy about" the change.  (Mem. in Opp'n at 32; <u>see also</u> Skare Aff. ¶ 16.) Her position as RNC was as a supervisor and consultant to eight facilities, whereas her position as DON involved her acting as a supervisor of only one facility.  Moreover, it does not appear that the DON and RNC positions were generally thought of as equivalent in status; Extendicare's Director of Human Resources for Wisconsin and Minnesota testified that a shift in position from DON to RNC would be considered a promotion.  (Schug Dep. Tr. at 56-7 ("It is a promotion to move into the Regional Director of Clinical Services . . . [f]rom the DON.").)

Extendicare argues that "a mere change in work assignments without a decrease in salary or (negative) work hour changes does not constitute an adverse employment action." (Mem. in Supp. at 36.)  However, "[t]o be 'adverse,' an employment action . . . need not always involve termination or <u>even a decrease in benefits or pay</u>."  <u>Brown</u>, 286 F.3d at 1045 (citation omitted) (emphasis added).  Furthermore, the fact that the DON position did not require Skare to use the same supervisory and consulting skills indicates that this was not a "minor [change] in [Skare's] working conditions."  <u>Id.</u>; <u>see also</u> <u>id.</u> at 1046 (noting that the

plaintiff's new position "prevented her from using her professional nursing skills" and the change was an adverse employment action despite receiving the same pay). Accordingly, drawing all inferences in favor of Skare, the Court determines that she has raised a genuine issue of material fact as to whether her change in position from RNC to DON was an adverse employment action. See id.

###    2.        Constructive Discharge

Skare also claims that she was constructively discharged in retaliation for her complaints. "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." Tatum v. Arkansas Dep't of Health, 411 F.3d 955, 960 (8th Cir. 2005) (internal quotation omitted). To establish a constructive discharge, a plaintiff must show that: (1) a reasonable person in her situation would find the working conditions intolerable, and (2) the employer intended to force the employee to quit. Id. "[I]ntolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." Gartman v. Gencorp, Inc., 120 F.3d 127, 130 (8th Cir. 1997) (internal quotation and alteration omitted). Further, "part of an employee's obligation to be reasonable is an obligation not to assume the worst and not to jump to conclusions too fast." Id. (internal quotations and alteration omitted) (emphasis in original).

Here, there are no facts suggesting the circumstances of Skare's employment were such that she was constructively discharged. Rather, the evidence belies her contention that her working conditions were sufficiently intolerable to allow a fact finder to conclude that

Skare's resignation resulted from a constructive discharge.  First, once she made the decision to resign, she set her effective resignation date for nearly a month out—she submitted her resignation letter on January 7, 2005, and set her last day of work for February 2, 2005.  (Thompson Aff. Ex. 27.)  This meant Skare was at work for almost a month after coming to her decision.  Moreover, in her resignation letter, she stated that she would "gladly make [her]self available to [assist in the hiring and training of her replacement] during the next few weeks."  (Id.)  These circumstances simply do not support Skare's claim of "intolerable working conditions" sufficient to state a claim for constructive discharge.  Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1248 (8th Cir. 1998); see also Knowles v. Citicorp Mortgage, Inc., 142 F.3d 1082, 1086 (8th Cir. 1998) (rejecting constructive discharge claim based, in part, on the fact that the plaintiff submitted a letter of resignation that did not raise any of his allegedly true reasons for leaving, rather than giving his employer a reasonable opportunity to rectify the situation).

Second, Skare argues that Burke's harassment and belittling behavior towards her as the DON at Robbinsdale made her working conditions intolerable.  But it is undisputed that she decided to resign two months after Burke changed positions at Extendicare and was no longer working with Skare at Robbinsdale.  (Cullen Aff. ¶ 20; Skare Dep. Tr. at 124-25.)  This undermines her claim that her working conditions were so intolerable that she was forced to resign.  See, e.g., Tatum, 411 F.3d at 960 (rejecting constructive discharge claim where the plaintiff "was forced to work in the same office as [her harasser], [but] she presented no evidence of any further harassment or inappropriate behavior" in the roughly

13

two months preceding her resignation).  Furthermore, even assuming that "the conditions

under which [Skare] worked may have been unpleasant and tinged with retaliatory acts, they

do not create an objectively intolerable atmosphere that <u>forced</u> [Skare] to resign."

<u>Coffman</u>, 141 F.3d at 1248 (emphasis in original) (internal quotation and alterations

omitted); <u>see also</u> <u>Breeding v. Arthur J. Gallagher and Co.</u>, 164 F.3d 1151, 1160 (8th Cir.

1999) (rejecting constructive discharge claim, noting that "[t]he working atmosphere was

not ideal, but a feeling of being unfairly criticized or having to endure difficult or

unpleasant working conditions are not so intolerable as to compel a reasonable person to

resign" (internal quotation and alteration omitted)).

Skare also argues that working at Robbinsdale put her "at risk of losing her license,"

and that she "continually reported situations in which abuse, neglect and law violating

policies jeopardized the health and safety of patients and employees."  (Mem. in Opp'n at

35-38.)  She contends that "[n]o reasonable person would be expected to continue to endure

such a repulsive work environment."  (Mem. in Opp'n at 37.)  She further points to the fact

that she was required to appear in front of the Board regarding citations received by

Robbinsdale, and that she did so without receiving assistance or legal representation from

Extendicare.  (<u>Id.</u> at 36-37.)  Again, the facts Skare has presented do not approach conduct

"so demeaning or abusive as to demonstrate an intolerable working environment intended to

force [Skare] to [resign]."  <u>Breeding</u>, 164 F.3d at 1160.

This argument also misses the point in a more fundamental way—Skare does not

claim that (what she perceived to be) the sub-par patient care at the Extendicare homes

14

constituted retaliatory attempts to force her to resign, which she must show in order to state a claim for constructive discharge.  In support of her claim, Skare argues that she "knew that in the facilities in which she worked and other Defendant facilities, people were dying or becoming more disabled and sick because of the extreme disregard for patient care."  (Mem. in Opp'n at 36.)  Skare's argument makes clear that the conditions she cites to as forming the basis of her constructive discharge claim were not specific to her; rather, according to Skare, they constituted a widespread condition throughout the company.[10] Where employees are subjected to the same working conditions, "no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign."  Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 797 (8th Cir. 1996) (internal quotation omitted).

Furthermore, in order to establish that she has been constructively discharged, Skare would have to present evidence that Extendicare "deliberately render[ed] [Skare's] working conditions intolerable, thereby forcing her to quit."  Tatum, 411 F.3d at 960 (8th Cir. 2005) (internal quotation omitted) (emphasis added).  Skare has not presented any evidence that anyone at Extendicare deliberately attempted to push her out of the company.  If fact, the evidence that has been presented would negate an inference of such deliberate conduct by Extendicare.  When she met with Cullen in the weeks before she left, Skare testified that

---

[10]With respect to the citations from the Board, Skare has not presented any evidence to suggest that either the citations themselves (which clearly did not originate with Extendicare), or the company's response to her request for assistance, were retaliatory acts.

Cullen told her to "name the position you want and the salary you want," in an effort to

convince her to <u>stay</u> at Extendicare.  (Skare Dep. Tr. at 168.)  <u>See</u> <u>Allen</u>, 81 F.3d at 797

(noting that supervisor's statement that the plaintiff "could be a valuable asset to the store,"

indicated that the supervisor "did not intend . . . to force [the plaintiff] to resign").

Therefore, the Court concludes that Skare has failed to raise a genuine issue of material

fact regarding her claim of constructive discharge.

### 3.    Harassment from Burke

Finally, Skare apparently claims that she suffered an adverse employment action

because Burke was harassing and belittling to her in retaliation for her complaints regarding

Extendicare's violations of laws, regulations, and policies.  (Mem. in Opp'n at 33.)  In

bringing up Burke's behavior towards her, Skare appears to be arguing that his behavior was

a factor in her feeling that she had no choice but to resign (<u>id.</u>); the Court has already

determined that her constructive discharge claim fails.  To the extent that Skare is arguing

that Burke's treatment of her was an adverse employment action in itself, however, this

claim also fails.  Skare's description of Burke's treatment of her consists of her claims that

he "would ridicule me in front of the staff."  (Skare Dep. Tr. at 40.)  She claims that for a

period of time, Burke would "complain to other department heads within the building about

[Skare's] performance about the job [she] was doing."  (<u>Id.</u>)  And that he would "tell [Skare]

that [she] obviously didn't know what [she] was doing, and that [they] obviously had

disagreements."  (<u>Id.</u> at 41.)  That behavior only lasted until July 2004.  (<u>Id.</u> at 42.)

However, after that point, Skare was told by a co-worker that Burke had said he "was

16

watching [Skare] closely and that [she] would have to prove [her]self." (Id. at 42.)  She also

contends that Burke asked her for hugs on three occasions.  (See id. at 40.)

 While this evidence may indicate that Burke and Skare did not have an optimal

working relationship, Burke's conduct does not amount to an adverse employment action.[11]

See, e.g., Breeding, 164 F.3d at 1160; Coffman, 141 F.3d at 1248.  Accordingly, the Court

determines that Skare has not raised a genuine issue of material fact with respect to

whether Burke's treatment of her constituted an adverse employment action.  Therefore,

the Court will proceed to consider whether Skare has established a prima facie case under

the Whistleblower Act as to her demotion from RNC to DON, as that is the only adverse

employment action about which she has raised a genuine issue of material fact.

**B.** **Protected Activity**

 To support her claim of protected activity for purposes of her prima facie case,

Skare asserts that throughout her employment she made many complaints about practices at

Extendicare.  With respect to her demotion, she claims that Burke, and possibly others,

retaliated against her due to some of the complaints she made.  Stone testified, and Skare

does not dispute, that Burke was primarily responsible for the decision to change her

position from RNC to DON.  (Stone Dep. Tr. at 72-3 ("Jim Burke would have been as the

RDO in that area the person who would have had the most conversation with her about

---

[11]The Court assumes without deciding, for purposes of this Motion, that Skare can
state a claim under the Whistleblower Act alleging harassment as an adverse employment
action.  It notes, however, that Skare has cited no authority for this proposition.  (See Mem.
in Opp'n at 33.)

that."); Mem. in Opp'n at 12-14 (arguing that "it was Burke . . . who made the decision to demote Plaintiff"); but see Shug Dep. Tr. at 58 (testifying she believed that Stone was responsible for the decision[12]).)

Skare claims that she complained to Burke that Extendicare did not have an licensed administrator at Robbinsdale, which violated healthcare regulations.  (Skare Dep. Tr. at 35-37.)  She does not remember exactly when she told him, although it was in the April 2004 time frame.  (Id. at 36-37.)  Nor does she remember what his response was when she talked to him about it.  (Id. at 38 ("Q: And you said you told Jim Burke of your concern soon after he started.  What was his response? A: I don't remember.").)

She also claims that she talked to Burke regarding her concerns about Robbinsdale admitting patients that it did not have the facilities or staff to properly care for.  (Skare Dep. Tr. at 65-6.)  According to Skare, she "shared concerns with the ability of buildings to be able to care for patients that were being automatically admitted off of the Green Flag Program."  (Id. at 66.)  She does not "remember his exact response."  (Id.)  The only specific patient concern she talked to him about was a patient who weighed over 900 pounds, and whom she believed should not be admitted for care at Robbinsdale.  (Id. at 67.)

---

[12]To the extent that the evidence indicates that Stone was responsible for Skare's change in position from RNC to DON, the Court notes that Skare's testimony indicates that she does not believe Stone retaliated against her for any complaints Skare made.  (Skare Dep. Tr. at 120-21 ("Q: [Y]our position is not that [Stone] was affirmatively trying to hurt you, but just that she wasn't going—she wasn't doing anything to help you?  A: I would agree with that.").)

She believes that Burke retaliated against her because of these complaints by demoting her from RNC to DON at Robbinsdale. (Id. at 70-71.) Extendicare argues that Skare's complaints to Burke did not amount to protected conduct under the Whistleblower Act. (Mem. in Supp. at 31-35.) Specifically, Extendicare claims that Skare did not make a "report" under the Act. (Id.)

The Whistleblower Act provides protection where an employee "in good faith, reports" a situation. Minn. Stat. § 181.932, subd. 1(d). Minnesota courts have characterized the requirement that an employee make a "report" as amounting to "relating or presenting concerns in an essentially official manner."[13] Janklow v. Board of Examiners for Nursing Home Administrators, 536 N.W.2d 20, 23 (Minn. Ct. App. 1995). The Court "may determine as a matter of law that certain conduct does not constitute a report for purposes of the Whistleblower Act." Cokley, 623 N.W.2d at 630 (citation omitted).

Skare's evidence in support of her claim that Burke retaliated against her consists of her testimony that she discussed some concerns regarding Extendicare's policies and practices with him; she does not remember the dates of her discussions, nor does she remember his responses to her complaints in any detail. Skare did not ever express her

---

[13]In Janklow, the Minnesota Court of Appeals recited the definition of "report" as: "1. To make or present an often official, formal, or regular account of. 2. To relate or tell about; present." 536 N.W.2d at 23 (quoting American Heritage Dictionary 1531 (3rd ed. 1992). In determining that there was an issue of fact as to whether the plaintiff's conduct in Janklow amounted to a "report" under the Act, however, the court focused on the fact that it amounted "to relating or presenting concerns in an essentially official manner." Id. (emphasis added); see also Buytendorp v. Extendicare Health Servs., Inc., 2006 WL 314500, at ** 3-4 (D. Minn. Feb. 9, 2006).

concerns to Burke in writing nor did she ever document her conversations with him.  In

addition, Skare never utilized Extendicare's Corporate Compliance program[14] to express

her concerns.  While Extendicare's Corporate Compliance program is not the only

mechanism through which an employee could make a "report" for purposes of the Act (as

Extendicare urges), Skare's lack of <u>any</u> formalization of her concerns, <u>see</u> <u>Janklow</u>, 536

N.W.2d at 23, dooms her Whistleblower Act claim.

　　　　Furthermore, to "qualify as a report under the statute, a report must 'blow the

whistle' by notifying the employer of a violation of law that is a clearly mandated public

policy."  <u>Cokley</u>, 623 N.W.2d at 631 (citation omitted).  And, to be protected under the

statute, "an employee must make the report for the purpose of exposing an illegality."

<u>Hitchcock v. FedEx Ground Package Systems, Inc.</u>, — F.3d —, 2006 WL 871082 at *1

(8th Cir. April 6, 2006) (citation omitted).  Skare has not presented evidence that her

complaints to Burke were made for the purpose of exposing an illegality.  Rather, she made

her complaints in the normal course of her job duties; those duties involved ensuring that

facilities she was responsible for were in compliance with company policies, laws, and

regulations.  (<u>See</u> Cullen Aff. ¶ 21 ("As DON and RNC, Skare had responsibility for

complying with federal and state laws and regulations, and advising management whenever

---

　　　　[14]Extendicare's Corporate Compliance Program "is intended to prevent, detect and
correct unlawful or unethical conduct."  (Cullen Aff. ¶ 23.)  While employees may "report
suspected wrongful conduct to their supervisor, if the supervisor does not address the
concern, the employee is obligated to bring the concern up their chain of command or to
the Corporate Compliance officers or Corporate Compliance hotline."  (<u>Id.</u> ¶ 24.)

she believed that the company or a particular facility was not in compliance."); see also

Skare Dep. Tr. at 53.)

Moreover, with respect to the only specific patient situation that she brought to

Burke's attention, she testified that she told Burke "we don't have the staff qualified, and we

didn't have the equipment to take him."  (Skare Dep. Tr. at 67.)  This is consistent with her

recitation of other "conversations" she had with Burke, Stone, and others, regarding her

concerns while at Extendicare.   Her testimony shows that she was doing her job and, in the

process, she raised concerns with her supervisors; it does not indicate that she made a

"report" under the Act for the "purpose of exposing an illegality."  See Hitchcock, 2006

WL 871082 at *1; see also Freeman v. Ace Telephone Association, 404 F. Supp. 2d 1127,

1139 (D. Minn. 2005) ("A report that is presented as part of an employee's job duties is not

a report under the Act." (citations omitted)).  In addition, in recounting her complaints, she

often cannot "remember the specific conversation" (see, e.g., id. at 82), nor when it took

place (see, e.g., id. at 59), nor what the response to her complaint was (see e.g., id. at 94).

Accordingly, the Court determines that Skare has failed to raise a genuine issue of fact

regarding whether she engaged in protected conduct under the Whistleblower Act, and her

claim will be dismissed.[15]

---

[15]The Court notes that, even if any of Skare's complaints could constitute "reports"
under the Act, Skare has failed to present any evidence of a causal connection between such
complaints and her demotion.  Skare's argument regarding a causal connection consists of
the fact that she "complained to her supervisor in April 2004," and her demotion to DON at
Robbinsdale occurred in late-June or early-July.  (Mem. in Opp'n at 39-41.)  This gap in
timing between her alleged protected activity and the adverse employment action, however,

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED** that Extendicare's Motion for Summary Judgment (Doc. No. 22) is

**GRANTED**, and Skare's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

      **LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: May 1, 2006                                s/ Richard H. Kyle
                                                     RICHARD H. KYLE
                                                     United States District Court

---

"dilutes" any inference of causation.  See, e.g., Kipp v. Missouri Highway & Transp.
Comm'n, 280 F.3d 893, 897 (8th Cir. 2002).